IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Daniel L. Horton, | ) | |
| | ) | |
| Plaintiff, | ) | Case No: 14 C 50194 |
| | ) | |
| v. | ) | |
| | ) | Judge Philip G. Reinhard |
| Winnebago County Sheriff's Department, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

For the following reasons, defendant Winnebago County Sheriff's Department motion for summary judgment [48] is granted in part and denied in part. At the next hearing, the parties are to discuss with Judge Johnston the scheduling of a settlement conference.

## STATEMENT-OPINION

On April 20, 2015, plaintiff Daniel L. Horton filed his second amended § 1983 complaint against defendant Winnebago County Sherriff's Department [21], alleging that defendant was deliberately indifferent to his medical needs.

On October 16, 2016, defendant filed a motion for summary judgment [48], memorandum in support [50], and Rule 56.1 statement of facts with attachments [49]. Defendant contends that plaintiff has failed to raise a genuine issue of fact as to deliberate indifference or *Monell* liability. *See* [50]. On November 14, 2016, plaintiff filed his response to the motion [52], response to the statement of facts [51], and Rule 56.1 statement of additional facts [51], along with an additional appendix of exhibits [53]. On December 4, 2016, defendant filed its reply [55] and response to plaintiff's additional facts [54].

On summary judgment, the court construes all facts and draws all inferences in the light most favorable to the non-moving party. *Schepers v. Commissioner, Indiana Dept. of Corrections,* 691 F.3d 909, 913 (7th Cir. 2012). The court does not weigh evidence or determine the credibility of witness testimony. *O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 630 (7th Cir. 2011). Instead, the court only grants summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That said, Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating the motions and the undisputed facts located in the parties' Local Rule 56.1 Statements of Material Fact with respect to each motion, the court is cognizant of its obligation

to construe all disputed and undisputed facts in the light most favorable to the plaintiff. *See Schepers*, 691 F.3d at 913.

I. Factual Background.

At all relevant times, plaintiff Daniel Horton was confined in the Winnebago County Jail located in Rockford, Illinois. [51] at ¶ 1. At all relevant times, the Winnebago County Sheriff's Department operated the Jail. [51] at ¶ 2. At all times during the plaintiff's incarceration, the Jail contracted with the UICOM-R to provide medical care and treatment to inmates at the Jail. [51] at ¶ 8.

In July 2012, due to a gunshot wound to his spine, the plaintiff became a paraplegic. [51] at ¶ 19. As a result of his paraplegia, the plaintiff must intermittently self-catheterize himself to urinate. [51] at ¶ 20. At all relevant times, plaintiff's standing prescription for catheters was seven to eight changes per day, which equates to roughly one change every 3-4 hours. [54] at ¶ 4. Prior to entering the Jail, plaintiff was instructed by his treating physicians never to reuse catheters. [54] at ¶ 1. Prior to entering the Jail, plaintiff had never reused a catheter. [54] at ¶ 2.

Prior to his incarceration, the plaintiff received outpatient physical therapy and occupational therapy at Van Matre HealthSouth Rehabilitation Hospital in Rockford, Illinois from approximately January 8, 2013 until May, 28, 2013, when he was discharged. [51] at ¶ 21. When the plaintiff was discharged from Van Matre, he was given physical therapy exercises to do at home. [51] at ¶ 22. The plaintiff was functionally independent with wheelchair mobility and was not expected to walk again at the time of his incarceration, and prior to his incarceration was told by a physician that the chance of him having motor function below the level of complete injury was zero. [51] at ¶ 23.

While incarcerated in the Jail, the plaintiff was provided with special accommodations included being lodged in the medical unit run by the UICOM-R for all but one week of his approximately one year stay. [51] at ¶ 24.

1. Catheters.

The technique the plaintiff used during his incarceration in the Jail when using UICOM-R provided catheters was clean intermittent catheterization, which is the insertion and removal of a catheter several times a day to empty the bladder. [51] at ¶ 30. Upon entering the Jail, plaintiff was only given one catheter and was informed by UICOM-R staff that he would have to reuse the catheter each time he needed to urinate. [54] at ¶ 5. At the time plaintiff was confined in the Jail, UICOM-R stocked "Dover" model number 400612 catheters manufactured by Covidien. [54] at ¶ 6. The catheters provided to plaintiff by UICOM-R were marked as "single-use-only" and featured a picture of a "2" crossed out. [54] at ¶ 7. In total, plaintiff received, at most, two catheters from UICOM-R shortly after entering the Jail. Plaintiff was forced to reuse these catheters provided by UICOM-R until plaintiff's family could supply him with outside catheter kits. [54] at ¶ 8.

The catheter kits provided by plaintiff's family were "Cure Catheter Closed System" catheterization kits. Each kit contained one pair of ambidextrous gloves, three povidone – iodine swabs, one BZK wipe, one 1500 ml. collection bag, one underbag, one wipe, and the catheter itself. The "Cure Catheter Closed System" catheter kits feature markings stating "single-use-only," "sterile unless opened or damaged," "for single use only," "do not re-sterilize." [54] at ¶ 9. Plaintiff received approximately 200 Cure Catheter Closed System catheter kits from his family per month, allowing plaintiff to use a new and sterile catheter each time he needed to urinate. [54] at ¶ 10.

The UICOM-R allowed plaintiff's mother and his girlfriend, Dawn Golden, to supply and bring to the Jail catheters for the plaintiff's use from October 19, 2013, until the last supply of catheters Dawn Golden brought to the Jail on September 11, 2014. [51] at ¶ 26. After September 11, 2014, the plaintiff's mother and girlfriend stopped delivering catheters to the Jail, due to the plaintiff's health insurance, Medicaid, not paying for the catheters as it had done previously. [51] at ¶ 27.

When his supply of Cure Catheter closed System catheter kits from home ran out in late September 2014, plaintiff was forced to rely upon his old catheters as well as the catheters provided by UICOM-R until he was transferred to the Illinois Department of Corrections on October 23, 2014. [54] at ¶ 11. Plaintiff ran out of his previous supply a "few times," at which time he used catheters supplied by the UICOM-R. [51] at ¶ 28. During his entire time he was incarcerated in the Jail from October 18, 2013 until October 23, 2014, the plaintiff estimated the number of days he used catheters supplied by the UICOM-R may have been approximately nine days. [51] at ¶ 29.

Plaintiff was instructed by Valerie Lewis, a UICOM-R nurse, that he should re-sterilize his already-used catheters by placing them in a solution of vinegar and water. Plaintiff testified that Valerie Lewis stated she saw this procedure on Youtube.com. [54] at ¶ 12. Plaintiff testified that he requested additional catheters, but was always only given one catheter to reuse per week. [49-3] at 108-09. Plaintiff testified that the nurses told him it was jail policy to give one catheter per week to reuse because there were insufficient catheters to give more. *Id*. at 142. Plaintiff also testified that he gave some of his own catheters to other inmates who had been asked to reuse catheters. *Id*. at 137. Plaintiff never tried to clean the catheters supplied by the UICOM-R with a vinegar water mixture given to him by the UICOM-R; according to plaintiff, he never used it because he was skeptical of re-sterilizing single-use-only catheters in such a way. [51] at ¶ 33. Instead, plaintiff cleaned the catheters after every time he used one with hot water and anti-bacteria soap from his cell, heating the water from his cell in a microwave in his Jail housing unit pod. [51] at ¶ 34.

Plaintiff was provided by the UICOM-R with medical supplies to enable him to self-catheterize, including, but not limited to, catheters, a cleaning solution, lubrication, a zip lock bag and a bedside urinal in which to empty his urine in and was observed self-catheterizing by the UICOM-R nursing staff to ensure that he knew how to do it correctly. According to plaintiff, he sometimes received the items but denies that he received them with sufficient frequency so as to avoid a "potentially fatal infection." [51] at ¶ 32. Further, according to plaintiff, he commonly did not receive lubrication to aid him in inserting his catheters. Where plaintiff did

receive lubrication, it was placed in a paper cup and dried up quickly. Accordingly, plaintiff often used water to lubricate his catheters before using them. [54] at ¶ 13. After multiple reuses, plaintiff already-used catheters became visibly dirty and caked with urine. [54] at ¶ 15.

As a result of reusing catheters, and despite his paralysis, plaintiff experienced pain and suffering that he rated at an 8-9 on a scale of 10. [54] at ¶ 16. While being forced to reuse catheters, plaintiff observed that he was urinating blood. Such blood in plaintiff's urine was noted and treated by the medical staff at the IDOC shortly after plaintiff was transferred there on October 23, 2014. [54] at ¶ 17.

According to UICOM-R physician Dr. Vivek Kantayya who saw the plaintiff in the Jail as a patient, the single-use label on the catheters provided by the Jail does not automatically mean that a catheter is incapable of being safely reused and may safely be reused using the clean intermittent technique described above; according to plaintiff, this opinion does not conform to the applicable standard of care. [51] at ¶ 35. It is Dr. Kantayya's opinion that sterile/single use catheters were not medically necessary for the plaintiff during his incarceration and that repeated or reuse of the same catheter for multiple catheterizations using a clean technique in the plaintiff's case was within the applicable standard of care; plaintiff denies that this opinion conforms to the applicable standard of care. [51] at ¶ 36. Dr. Kantayya opines that urinary tract infections and bleeding at the urethra are known and accepted conditions in paralyzed patients who self-catheterize. [51] at ¶ 37.

At the behest of the UICOM-R, urinalyses were performed on the plaintiff on 11/26/13, 6/10/14, 6/12/14, 7/9/14, 7/16/14, 7/21/14, and 7/22/14 to address the plaintiff's complaints. [51] at ¶ 38. It is Dr. Kantayya's opinion that a urinary tract infection that plaintiff developed in June of 2014, prior to using catheters supplied by the UICOM-R, was idiosyncratic and treated promptly and appropriately with Bactrim and did not cause permanent injury. [51] at ¶ 39. He also opines that any blood in the urine reported by the plaintiff was due to the way in which he self-catheterized as paralyzed patients oftentimes do not feel pain associated with inserting the catheter and may inadvertently apply too much force, resulting in benign blood in the urine, which is not a serious or permanent medical condition. [51] at ¶ 40.

2. Physical Therapy.

According to plaintiff, after entering the Jail, he was informed by UICOM-R staff that he would not receive assistance in doing his physical therapy exercises. Instead, plaintiff was given a towel and was told to do physical therapy exercises by himself. [54] at ¶ 21. Plaintiff could not accomplish his physical therapy exercises to the same extent he could if he were to have received assistance. [54] at ¶ 22. As a result of not performing his physical therapy exercises to a sufficient degree, plaintiff experienced pain, suffering, stiffness, and drop foot. [54] at ¶ 23.

On December 16, 2013, the UICOM-R gave the plaintiff a bath towel to use for his leg lift exercises and a pillow for positioning. [51] at ¶ 46. On December 17, 2013, the UICOM-R instructed the plaintiff on how to do self-range of motion exercises in his cell and was observed by the UICOM-R to perform his range of motion exercises. [51] at ¶ 47. On December 21,

4

2013, the plaintiff was educated by the UICOM-R on ways to stretch his hip muscles. [51] at ¶ 48.

At Dr. Kantayya's request, on July 24, 2014, the plaintiff was taken out of the Jail to visit the office of the plaintiff's own physician, Dr. Andrew Vo, for pain management and rehabilitation consultation. [51] at ¶ 49. The Jail Corrections staff transported plaintiff to and back from Dr. Vo's office. [51] at ¶ 50.

During his office visit, Dr. Vo explained to the plaintiff that he will never be able to walk again due to the mechanism and nature of his spinal cord injury and that he may do strengthening exercises for his arms independently; plaintiff notes that Dr. Vo did not rule out additional physical therapy, but rather "would discuss the situation with the Rehabilitation doctors at Van Matre hospital to discuss whether or not [plaintiff] would benefit from additional outpatient PT." [51] at ¶ 51. In connection with Dr. Vo's examination of the plaintiff at his office on July 24, 2014, Dr. Vo's office sent the plaintiff via the UICOM-R at the Jail, a 39-page pamphlet of back and neck exercises that the plaintiff could do on his own at the Jail. [51] at ¶ 52.

On August 26, 2014, UICOM-R Nurse Practitioner Kellie Gibbons reviewed the pamphlet of exercises with the plaintiff to ensure that the plaintiff could do them on his own and provided the pamphlet to him for reference. [51] at ¶ 53.

While the plaintiff was incarcerated in the Jail, Dr. Kantayya and UICOM-R nurse manager Valerie Lewis were not aware of any medical orders for the plaintiff to do physical therapy off-site outside of the Jail. [51] at ¶ 44. It is Dr. Kantayya's opinion that off-site physical therapy was not medically necessary for the plaintiff; plaintiff denies that this opinion conforms to the standard of care. [51] at ¶ 45.

3. Grievances.

Inmates at the Jail can electronically file grievances about any aspect of inmate life on a kiosk system located in the housing unit. [51] at ¶ 54. Inmates can specify on the kiosk system that medical related grievances are electronically sent directly to the UICOM-R staff who work in the Jail instead of being sent to corrections officers who work in the Jail. [51] at ¶ 55. During his confinement at the Jail, plaintiff submitted numerous grievances concerning his physical therapy. [54] at ¶ 24.

On April 20, 2014, the plaintiff electronically filed a grievance that was routed to corrections due to being categorized as "general" complaining about not having his "therapy" and range of motion. [51] at ¶ 60. Within 16 hours of plaintiff filing the grievance, Jail corrections personnel responded electronically to plaintiff's grievance in writing by advising plaintiff to "please address this request with medical"; according to plaintiff, he believed the jail medical staff worked at UICOM-R but were employed by the Jail. [51] at ¶ 61.

On October 5, 2014, the plaintiff electronically filed a grievance that was routed to corrections due to being categorized as "general" in which he complained about not receiving new catheters for two weeks and not getting his range of motion. [51] at ¶ 56. Approximately

5

two hours after plaintiff filed his grievance, Jail corrections personnel responded electronically to plaintiff's grievance in writing by advising plaintiff to "Submit to Medical Grievance"; according to plaintiff, he believed the jail medical staff worked at UICOM-R, but were employed by the Jail. [51] at ¶ 57.

On October 9, 2014, the plaintiff electronically filed a grievance that was routed to corrections due to being categorized as "general" complaining about reusing catheters; plaintiff stated that he had been without catheters for three weeks. The Jail representative replied "medical is aware of the issue and dealing with it according to medical guidelines." [54] at ¶ 39.

During the time plaintiff was incarcerated in the Jail, former Sheriff of the Department, Richard Meyers, oversaw corrections operations in the Jail and Andrea Tack, who reported to Sheriff Meyers, was Superintendent of the Jail. [51] at ¶ 62. Neither Sheriff Meyers nor Superintendent Tack have a medical background or medical training. [51] at ¶ 63.

Sheriff Meyers never spoke with plaintiff when he was incarcerated in the Jail. [51] at ¶ 66. Sheriff Meyers testified that he is not aware of any instance of any inmate in the Jail not receiving reasonable medical care for his or her necessary medical needs since the UICOM-R first contracted with Winnebago County and the Sheriff in January of 2005 to provide medical care and treatment to inmates in the Jail. [51] at ¶ 67. Since January of 2005, Sheriff Meyers has never directed any UICOM-R medical staff member not to provide medical treatment to a Jail inmate. [51] at ¶ 68. Since January of 2005, Sheriff Meyers and Superintendent Tack have never overruled a decision made by UICOM-R medical staff who worked in the Jail to send or not to send a Jail inmate to a medical provider outside the Jail. [51] at ¶ 69.

After being advised of plaintiff's complaints, plaintiff's mother Geraldine Horton informed Sheriff Meyers of plaintiff's forced reuse of single-use-only catheters and deprivation of physical therapy by speaking with him on the telephone twice. One of these conversations took place in October 2014. [54] at ¶ 25. Sheriff Meyers vaguely recalls speaking with Ms. Horton on the telephone about medical related issues pertaining to the plaintiff, but does not recall the specifics of what medical related issues were mentioned. [51] at ¶ 70.

In connection with Ms. Horton's telephone call to him, Sheriff Meyers testified that he had no reason to believe he did not do what he typically did when a family member of a Jail inmate contacted him about inmate medical issues – to tell the family member to speak with Superintendent Tack, give the family member Superintendent Tack's office telephone number and then when he hung up, he would telephone Superintendent Tack to tell her to expect a telephone call from the family member. [51] at ¶ 71. Superintendent Tack spoke with Ms. Horton at least two or three times on the telephone and met with her in person once at the Jail. [51] at ¶ 72.

According to Superintendent Tack, Ms. Horton told Superintendent Tack during all those conversations that she wanted Superintendent Tack to go to court to get the plaintiff released from Jail, wanted the plaintiff to go outside the Jail for therapy and wanted the UICOM-R nurses to give plaintiff his medications while the plaintiff was in bed, but did not recall Ms. Horton speaking to her about catheters. [51] at ¶ 73. Superintendent Tack told Ms. Horton she would

pass along her medical concerns about the plaintiff to the UICOM-R because the UICOM-R were the ones in charge of making medical decisions and also told her that UICOM-R would follow up with her if the UICOM-R thought it was appropriate. [51] at ¶ 74. Every time Superintendent Tack spoke with Ms. Horton, she would tell Sheriff Meyers about the content of her conversation with Ms. Horton, that she made UICOM-R aware of Ms. Horton's concerns about plaintiff's medical care, and that UICOM-R was dealing with Ms. Horton's concerns. [51] at ¶ 75. According to Sherriff Meyers, Sheriff Meyers never received word from Superintendent Tack there were any problems with the medical care of plaintiff during the entire time plaintiff was incarcerated in the Jail. [51] at ¶ 76.

Due to Ms. Horton's complaints about her son's medical care, Superintendent Tack arranged a meeting on March 4, 2014, in the UICOM-R medical clinic located in the Jail between plaintiff, herself, Jail Captain Tim Owens, and UICOM-R staff members Dr. Kantayya, Nurse Practitioner Kellie Gibbons, Nurse Manager Valerie Lewis, and UICOM-R student physician Dr. Wang, so that plaintiff could present all his medical concerns. [51] at ¶ 77. At the meeting, plaintiff voiced four medical concerns, none of which involved reusing catheters, and Dr. Kantayya addressed each of plaintiff's concerns during the meeting and took action on which he noted in medical records; plaintiff clarifies that at the meeting in March 2014, plaintiff was receiving sufficient amounts of catheter kits from his family members and, therefore, at the time of the meeting was not forced to reuse single-use-only catheters. [51] at ¶ 78.

According to Dr. Kantayya's records, regarding the plaintiff's concerns in the meeting of not getting physical therapy, Dr. Kantayya noted in the records the plaintiff "has been instructed by our staff on how to do ROM [range of motion] exercises for his lower extremities" and also noted his plan was to "have staff instruct again how to do self PT [physical therapy] using a towel or sheet." [51] at ¶ 79. The UICOM-R, not Meyers, Tack, or Department officers, made all medical care decisions regarding plaintiff, including his catheterization and whether plaintiff should be taken to see a doctor outside the Jail. [51] at ¶ 80.

4. Expert Opinions.

Dr. Robert F. Sing, plaintiff's expert, prepared a report on the propriety of plaintiff's use of catheters while he was confined at the Jail. [54] at ¶ 28. In Dr. Sing's opinion, "providing the 200 sterile urinary catheters with the accompanying required equipment such as sterile gloves, antiseptic swabs and wipes, and sterile lubricant for catheter passage, is mandatory for this patient. Anything less would potentially expose this patient to recurrent urethral trauma and potentially a fatal infection." [54] at ¶ 29. Dr. Sing also opined that the "clean technique" cited by Dr. Kantayya was not appropriate because plaintiff had experienced a urinary tract infection and plaintiff's jail accommodations were likely not clean enough. [54] at ¶ 30. Dr. Sing also opined that there was no support in any medical literature for sterilizing catheters with a vinegar and water solution. [54] at ¶ 31.

Donna Burrough, plaintiff's aunt, is a registered nurse in the State of Texas and has at least thirty-five years of experience, including a stint working as a nurse for UICOM-R's predecessor at the Jail in the late nineties. [54] at ¶ 32. In her deposition, Ms. Burrough opined that the U of I's policy of reusing catheters was "appalling," that she had never seen such a

7

practice in her entire career, and that reusing catheters would significantly increase the risk of a UTI and kidney infection. [54] at ¶ 33. Ms. Burrough also opined that vinegar and water would not be sufficient to sterilize a catheter sufficiently and that, even if the catheters could be re-sterilized, they would not remain so because of the conditions at the jail. [54] at ¶ 34. Ms. Burrough stated that, as a nurse, she would never recommend that a patient or an inmate reuse a catheter. [54] at ¶ 35. Ms. Burrough also noted that the consequences of not doing physical therapy would be permanent muscle contractions, limited range of motion on a permanent basis, atrophy, phantom pain, and drop foot. [54] at ¶ 36. Furthermore, Ms. Burrough opined that, for plaintiff specifically, physical therapy was "[e]xtremely important" even if there was no prospect of plaintiff regaining the ability to walk again. [54] at ¶ 37.

II. Analysis.

The court will first determine whether plaintiff has raised a genuine issue of fact as to his claim that defendant forced him to reuse catheters over a period of days. Next, the court will determine whether plaintiff has raised a genuine issue of fact as to his claim that defendant refused to provide him with outside physical therapy.

A. Reusing Catheters.

Defendant contends that there is insufficient evidence that it can be held liable under § 1983 for UICOM-R's alleged single-use catheter policy, and that there is insufficient evidence that the policy was deliberately indifferent.

1. Whether defendant can be liable for UICOM-R's policies.

First, with regard to whether defendant can be held liable for UICOM-R's policy, plaintiff persuasively argues that final policymaking authority for medical decisions was delegated to UICOM-R. Plaintiff points to *King v. Kramer*, 680 F.3d 1013 (7th Cir. 2012) to support the proposition that municipalities can delegate final authority to private health care provider. In that case, the Seventh Circuit held that "[a] County cannot shield itself from § 1983 liability by contracting out its duty to provide medical services." *See id.* at 1020. The Seventh Circuit noted that "[t]he underlying rationale is not based on respondent superior, but rather on the fact that the private company's policy becomes that of the County if the County delegates final decision-making authority to it." *Id.* In *King*, the Seventh Circuit found that the evidence was sufficient for a jury to find that the County had delegated authority to a private corporation because the County had contracted for the corporation to provide medical services:

> The evidence presented for summary judgment purposes shows that the County's policy was to entrust final decision-making authority to [the corporation] over inmates' access to physicians and medications. Nothing in the record as of now suggests that the County had higher aspirations for the care it was providing, but that those standards were not met.
> . . . .

> The County's express policies as embodied in the contract show that the County delegated to [the corporation] final authority to make decisions about inmates' medical care.

*Id*. at 1020-21.

Here, the court finds that there is sufficient evidence to show that defendant delegated to UICOM-R final authority to make decisions about inmate's medical care, including the reuse of catheters. First, as in *King*, it is undisputed that defendant "contracted with the UICOM-R to provide medical care and treatment to inmates at the WCJ including the Plaintiff, with UICOM-R employing the medical staff at the WCJ." *See* [51] at ¶ 8. Further, defendant explicitly acknowledges that "[t]he UICOM-R, not [defendant or its officers], made all medical care decisions regarding plaintiff, including his catheterization[.]" *See* [51] at ¶ 80. Finally, there is evidence that defendant's officers fully delegated decision-making authority to UICOM-R even in the face of inmate complaints of mistreatment. For example, when plaintiff's mother spoke to Sheriff Meyers and then Superintendent Tack about the reuse of catheters, Superintendent Tack stated that she would pass along plaintiff's medical concerns to the UICOM-R "because the UICOM-R were the ones in charge of making medical decisions" and that "UICOM-R would follow up with [plaintiff's mother] if the UICOM-R thought it was appropriate." *See* [51] at ¶ 74. As such, the court finds that this case is analogous to *King* and that UICOM-R's policies were effectively defendant's policies for purposes of § 1983.

2. Whether UICOM-R had a policy of reusing catheters.

Moving to the alleged policy itself, the court first finds that plaintiff has raised sufficient evidence that a reasonable jury could find that it was UICOM-R's explicit policy to provide only a limited number of single-use catheters to inmates, requiring them to reuse the catheters. As noted above, plaintiff has testified that he was only allowed one single-use catheter per week when relying on UICOM-R for catheters because UICOM-R did not have sufficient catheters to provide inmates with a catheter for each use. Plaintiff also testified that he was instructed by the various nurses that supplied him with catheters that he was to reuse the catheter using vinegar as a sanitizing solution. Finally, plaintiff testified that other inmates with catheters were only given limited catheters and that in some cases he provided other inmates with his own catheters so they would not need to reuse UICOM-R catheters. The court need not consider whether plaintiff's testimony regarding other inmates would be sufficient alone to show a widespread practice; rather, plaintiff's testimony is additional evidence supporting the existence of an explicit policy. Together, plaintiff's evidence is sufficient to raise a genuine issue of fact as to whether UICOM-R had an explicit policy to provide inmates with a limited number of catheters, requiring inmates to reuse them.

3. Whether the policy to reuse catheters was deliberately indifferent.

Defendant argues that even if such a policy existed, it did not constitute deliberate indifference with regard to plaintiff. For support, defendant points to *Jenkins v. Mohr*, 2014 WL 4748619 (S.D. Ohio 2014), a magistrate judge report and recommendation that was later adopted by the district court in *Jenkins v. Mohr*, 2014 WL 7403992 (S.D. Ohio 2014). In Jenkins, the

plaintiff alleged that he was given only three single-use catheters per week instead of one catheter for each time he needed to urinate. The plaintiff was given a manual for how to sanitize the catheters using soap and water, and when he complained that this was insufficient, was given an antiseptic. The plaintiff did not provide support in his complaint from medical experts. The court found that the plaintiff's complaint "demonstrates that plaintiff disagrees with defendants about the frequency with which his catheters should be replaced. Such a disagreement does not, however, amount to a constitutional violation." *Jenkins*, 2014 WL 4748619, at \*5 (collecting cases dismissing claims alleging insufficient replacement of catheters).

As an initial matter, while this court has not located Seventh Circuit precedent related to the reuse of external catheters, other district courts have found that the failure to provide sufficient external catheters can constitute deliberate indifference. In *Jefferson v. Overton*, 2017 WL 3922909 (W.D. Penn. 2017), the court denied the defendants' motion for summary judgment after agreeing with the plaintiff that there was sufficient evidence to find that the prison official defendants "knowingly disregarded the fact that [the plaintiff] was suffering chronic infections as a result of reusing 'single use' catheters in an institutional setting" and the defendants had denied the plaintiff's "reasonable requests for infection control measures such as sterile gloves, antiseptic wipes, and a sufficient number of catheters to comply with 'single use' labeling." *See id.* at \*6. *See also Bentancourt v. Florida Department of Corrections*, 2014 WL 10742621 (M.D. Fl. 2014) (finding that "a genuine dispute of material fact exists regarding the sufficiency of Plaintiff's supply of catheters" where plaintiff "allegedly received a Coloplast catheter that indicates it is 'Single Use Only'"); *Washington v. Tennessee*, 2014 WL 5035217, at \*4 (M.D. Tenn. 2014) (denying motion to dismiss where "the plaintiff alleges that he has recurrent, painful, and potentially life-threatening bladder infections resulting from the refusal of the medical care providers . . . to provide a sterile catheter each time he needs to empty his bladder, or even to provide antiseptic wipes or gloves or other materials to help him clean and sterilize the catheters that he is required to reuse"); *Kozlowski v. United States*, 2009 WL 612172 (E.D. Mich. 2009) (noting that "Plaintiff alleges that the catheters were designed for a single use, not intended to be cleaned and reused" and finding that "Plaintiff's allegation that [the defendant] authorized one catheter a week instead of twenty eight is enough to state a claim for deliberate indifference"). As such, the court does not consider the *Jenkins* decision dispositive of this issue and will apply normal standards for deliberate indifference as articulated by the Seventh Circuit.

The Seventh Circuit has held that "[t]o state an Eighth Amendment claim based on deficient medical care, a plaintiff must allege an objectively serious medical condition and an official's deliberate indifference to that condition." *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015). "Deliberate indifference may occur where a prison official, having knowledge of a significant risk to inmate health or safety, administers 'blatantly inappropriate' medical treatment." *Id.* at 777. While this court has not found Seventh Circuit precedent directly related to the subject of external catheters, in the context of indwelling catheters, the Seventh Circuit has held that "[a] needless delay in providing medical supplies may violate the Eighth Amendment depending on the seriousness of the condition and the ease of providing treatment and whether the plaintiff provides independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Stewart v. Wall*, 688 F. App'x. 390 (7th Cir. 2017) (internal quotations and alterations omitted).

The normal standards of harm, causation, and deliberate indifference apply. In *Stewart*, the Seventh Circuit found that the mere allegation of delays in replacing indwelling catheters alone was insufficient where there was no evidence of harm or of deliberate indifference:

> [The plaintiff] describes a few delays in receiving sterile equipment or replacement catheters that range from hours to one week. Although he has argued that these delays cause him pain, he has not sworn to it. More fundamentally though, he has not argued, let alone furnished evidence, that the staff had control over the delays in providing these supplies and could have easily avoided these delays. Without such evidence, the Eighth Amendment claim fails.

*Id*. at 394.

In *Newell v. Ngu*, 589 F. App'x. 782 (7th Cir. 2014), the Seventh Circuit found that there was sufficient evidence for a jury to find harm as a result of delays in changing an indwelling catheter where the plaintiff proffered evidence of harm and expert testimony that the harm was caused by delays in changing the indwelling catheters:

> We . . . reject [the defendant's] contention on appeal that [the plaintiff's] testimony that he was harmed by the delayed catheter changes should have been disregarded because the plaintiff lacks "medical training." Lack of medical expertise might prevent [the plaintiff] from giving an opinion on causation, but it doesn't render inadmissible his testimony that he suffered from recurring urinary tract infections and experienced pain and discomfort during the extended period that his catheter was not being changed properly. A jury reasonably could infer that [the plaintiff's] infections and pain resulted from the lack of appropriate attention to his catheter, a conclusion that seems frivolous to dispute given the extensive medical records of treatment for infections and [the plaintiff's expert's] opinion.

*Id*. at 786. The court in *Newell* nonetheless found that there was no deliberate indifference because the defendant physician had ordered appropriate monthly changes, the delay was attributable to the nursing staff, and "it is not clear what [the defendant] could have done about the scheduling failure, given his testimony that his job was 'more of an administrative position' and that he did not 'directly' supervise the nursing staff." *Id*. at 787.

Here, plaintiff has proffered evidence that he suffered harm during those incidents where he had to rely on the Jail's catheters and was forced to reuse them, in some cases with insufficient lubricant. Plaintiff testified that he suffered pain and was urinating blood after reusing the Jail's catheters. Plaintiff's expert Dr. Sing opined that reusing catheters in a prison setting was inappropriate and that plaintiff's urethral trauma was likely due to reusing catheters with insufficient lubricant. Plaintiff's aunt, Ms. Burrough, is a registered nurse and gave deposition testimony as an expert witness. Ms. Burrough testified that UICOM-R's policy of reusing catheters was "appalling," and she had never seen such a practice in her entire career. Further, she testified that reusing catheters would significantly increase the risk of a UTI and kidney infection, and that plaintiff's pain and bleeding were likely caused by reusing the

catheters. The court finds that plaintiff has raised a genuine issue of fact as to whether he suffered harm that was caused by UICOM-R's policy of reusing catheters.

With regard to deliberate indifference, defendant argues that plaintiff has presented no more than disagreement as to whether reusing single-use catheters is an appropriate treatment method for inmates in plaintiff's position. Defendant points out that Dr. Vivek Kantayya testified that reusing catheters is within the applicable standard of care and that plaintiff's reported symptoms were merely known and accepted conditions in paralyzed patients who self-catheterize. Defendant argues that plaintiff has, at best, raised an issue of medical malpractice, not deliberate indifference. As the Seventh Circuit has held, "[m]ere medical malpractice or a disagreement with a doctor's medical judgment is not deliberate indifference." *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007). On the other hand, "a plaintiffs receipt of some medical care does not automatically defeat a claim of deliberate indifference if a fact finder could infer the treatment was so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate a medical condition." *Id*. (internal quotations omitted).

This case presents a close question. On the one hand, plaintiff's expert Dr. Sing's report is arguably too equivocal to support a finding that reusing catheters was "blatantly inappropriate." Dr. Sing's report states "Although Dr. Kantayya describes some arguable points regarding reusable urinary catheterizations, I frankly disagree with his conclusions." *See* [53-1] at 12. He goes on to say that "Dr. Kantayya noted that reuse catheters 'using a clean technique' is accepted practice in medical community, and this may be the case in a patient who has never had a UTI and is in a much better clean situation, a situation that is not likely found in a prison cell." *See* [53-1] at 13. On the other hand, Ms. Burrough testified that a policy of reusing catheters in an inmate setting was "appalling," and she had never seen such a practice in her entire career. Taking all inferences in favor of plaintiff, the court finds that a reasonable jury could find that the reuse policy was "blatantly inappropriate" as applied to plaintiff and his situation. As such, summary judgment is denied with respect to plaintiff's claim regarding reuse of the single-use catheters.

2. Physical Therapy.

Plaintiff also claims that defendant was deliberately indifferent for failing to provide him with outside physical therapy. Defendant argues that there is no evidence that any prison officials had reason to believe that outside physical therapy was medically necessary. The court agrees.

The Seventh Circuit has held in similar circumstances that prison officials were not deliberately indifferent for failing to provide outside physical therapy. In *Burton v. Downey*, 805 F.3d 776 (7th Cir. 2015), the plaintiff's outside physician recommended physical therapy and explained stretching exercises to the plaintiff. Prison officials later contacted the outside physician, who stated that the plaintiff could do stretches in his cell. Nurses provided the plaintiff with written instructions as to relevant stretches. The last time the plaintiff saw the outside physician, he recommended physical therapy to plaintiff if he could convince the courts that he should receive it. No outside physical therapy was ever authorized. The Seventh Circuit found that the plaintiff "fails to present evidence that the medical defendants, who contacted [the

outside physician] and followed his recommendations for treatment, acted with the requisite state of mind for deliberate indifference." *Id*. at 786.

Here, the evidence is similar to that in *Burton*, which the Seventh Circuit found insufficient. Prison officials educated plaintiff as to how to do a variety of physical therapy using a towel in his cell. At Dr. Kantayya's request, plaintiff was taken out of the Jail to visit Dr. Andrew Vo, plaintiff's physician, for pain management and rehabilitation consultation. At that time, Dr. Vo did not order physical therapy and did not rule it out, but rather told plaintiff he would discuss the matter with rehabilitation physicians to discuss whether plaintiff would benefit from further outpatient physical therapy. Dr. Vo also sent plaintiff through UICOM-R a 39-page pamphlet of back and neck exercises that the plaintiff could do on his own at the Jail. Nurses provided the pamphlet to plaintiff and reviewed it with him to ensure he understood how to perform the exercises. Dr. Kantayya's testified that off-site physical therapy was not medically necessary for the plaintiff. Neither Dr. Kantayya nor UICOM-R nurse manager Valerie Lewis were not aware of any medical orders from Dr. Vo or others for the plaintiff to do physical therapy off-site outside of the Jail.

In short, plaintiff has proffered no evidence that prison officials provided "blatantly inappropriate" treatment or failed to follow the advice of specialists. To the contrary, the evidence tends to show that the prison officials followed Dr. Vo's advice. Plaintiff has failed to raise a genuine issue of fact as to whether the failure to provide outside physical therapy was deliberately indifferent. As such, defendant's motion for summary judgment is granted with respect to plaintiff's claims pertaining to physical therapy.

For the foregoing reasons, defendant Winnebago County Sheriff's Department motion for summary judgment [48] is granted in part and denied in part. At the next hearing, the parties are to discuss with Judge Johnston the scheduling of a settlement conference.

Date: 9/27/2017                                  ENTER:

*Philip G. Reinhard*
United States District Court Judge

Electronic Notices. (LC)
Copy to Magistrate Judge Johnston